**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00141-CR**
_____

**ANTHONY MAURICE JACKSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 17-11-13621-CR**

**MEMORANDUM OPINION**

A jury convicted Anthony Maurice Jackson of injuring a child, A.T.[1] *See* Tex.

Penal Code Ann. § 22.04(a). After he pled "true" to two enhancements for prior

felony convictions, the jury assessed punishment at sixty-five years of incarceration.

During trial, Jackson represented himself. Jackson appeals his conviction and in five

issues challenges 1) the denial of his motion to suppress, 2) the sufficiency of the

_____

[1]We use initials to identify the victim. *See* Tex. Const. art. I, § 30 (granting crime victims the right to be treated with fairness and with respect for their dignity and privacy).

evidence, 3) the trial court's denial of his motion for continuance, 4) the trial court's denial of his motion for additional funds to pay an investigator, and 5) the trial court's denial of his motion for mistrial. For the following reasons, we will affirm the trial court's judgment.

## Background

In March 2016, Jackson's fourteen-year-old daughter, A.T., was placed in his care. A.T. was intellectually disabled, autistic, had difficulty communicating, suffered from violent outbursts, and regularly attacked others around her. Witnesses who testified at trial estimated she operated at the level of a kindergartner or first grader. CPS had been involved with A.T., and CPS witnesses explained that she needed an intense level of care due to her behavior towards herself and others.

On October 15, 2016, A.T. collapsed at home, was unresponsive, and attempts to revive her were unsuccessful. The Montgomery County Precinct 3 Constable's Office responded to the scene, and the Montgomery County Sheriff's Office (MCSO) began an investigation into A.T.'s death. During the investigation, detectives uncovered evidence that Jackson used a stun gun on A.T. and ultimately charged him with injury to a child.

**Relevant Trial Evidence**

Guilt/Innocence[2]

DVR surveillance footage admitted at trial showed Jackson repeatedly activating a stun gun as indicated by a red light, contacting A.T. with it, and A.T. jerking from the stun gun. Detective Chris Evans testified at trial they never located the actual stun gun Jackson used in the videos, but they found a box with a brand name and model number and purchased an identical stun gun to operate in front of the jury.

A.T.'s bus driver, Janet Wells, testified at trial and described an incident where A.T. tried to pinch another student on the bus, and the other student told A.T. he was going to tell her father. A.T. responded by drawing back, making a noise that sounded like she was being shocked, and told him that "shocking hurt like hell." Wells reported this incident to CPS, because she was concerned that Jackson was using a stun gun on A.T. Wells explained that she heard A.T. say similar things on prior occasions. The thing that was different the day that Wells reported it to CPS was the sound A.T. made of something shocking her, which concerned Wells. Jackson admitted two bus driving incident reports into evidence that Wells prepared

---

[2]Since Jackson argues only that the evidence was insufficient to show that A.T. suffered pain, we limit our discussion to the evidence supporting that element of the offense. *See* Tex. R. App. P. 47.1 (requiring appellate courts to hand down an opinion as brief as practicable that addresses every issue raised and necessary to disposition of the appeal).

in July 2016. These reports noted A.T.'s statements that "Anthony shocked the hell out of me[,]" "shocking hurts[,]" and "shocking [sic] hot."

Dr. Pinneri, the forensic pathologist who performed an autopsy on A.T., testified that based on her review of the videos she would not expect the stun gun shocks to leave any marks. She described seeing A.T.'s arm jerk away from the stun gun caused by the electrical charge making the muscle contract. Dr. Pinneri testified that what she saw in the videos was consistent with an electrical shock being administered. Dr. Pinneri testified that A.T.'s reactions in the videos indicate she experienced pain, and "shocking hurts."

Detective Evans testified that the stun gun could cause localized pain when it contacted the skin but would not leave lasting injuries or marks. Evans testified they pulled videos contained within a download pursuant to the search warrant, and they have not been changed or altered in any way. While the DVR surveillance videos were played for the jury, Evans described some of the things he observed. Evans described instances where A.T.'s body reacts to the shock by flinching, and that her face appeared to "express pain" in response to the shock. Evans testified there were several occasions in the videos that he was positive that A.T. was shocked, and it caused pain. Evans testified that based on everything he reviewed, the original offense reports, CPS intake reports, interviews, photos, and videos, he believed the offense of injury to a child was committed.

4

Jerry Staton, a Taser and stun gun expert, testified for Jackson. Staton testified that touch stun guns hurt, so people move dramatically away from contact, and you often cannot see a mark. He disagreed with the State's witness who said by looking at the videos they were certain a shock was administered, but he noted it would help if the videos had sound. Staton explained that to determine whether someone was shocked, you needed to look for violent movement away from the device. Staton also testified that stun guns are meant for pain compliance, "they hurt[,]" and that is "the intent." Staton told the jury you could feel pain without seeing any injury. Staton agreed that even though the stun gun's effectiveness is reduced as the battery goes down, if the arc occurs and contacts someone's body, it will cause some level of discomfort.

Dr. Matthew Brams, a board certified psychiatrist, also testified as an expert for the defense. He explained that "[a]versive conditioning" was a way to stop unwanted behaviors by bringing in a "noxious stimulus, something that is not pleasant." Dr. Brams testified that institutions handling disruptive behaviors and intellectually disabled patients use aversive conditioning, and aversive shock therapy was approved by the FDA and American Association of Behavioral Therapists as safe and effective until 2020, but it is no longer approved. Dr. Brams testified that when A.T. was alive, several centers used it. He explained it was for people having self-injurious behavior and aggression. He opined that in very severe cases, it can be

5

very safe and effective. Dr. Brams testified that after watching the video, he would say A.T. had not been shocked; it came close and was scary to her, but that is the goal of aversive conditioning. The jury found Jackson guilty of injury to a child as charged in the indictment.

Punishment

The State included two enhancement paragraphs, which increased the punishment range from a minimum of twenty-five years to a maximum of ninety-nine years. Jackson pled "true" to these enhancements, and the jury was instructed to find the enhancements "true" given Jackson's plea. During punishment, copies of prior judgments of Jackson's felony convictions were admitted, and an expert confirmed the fingerprints matched. The jury sentenced Jackson to sixty-five years of confinement.

**Procedural Posture**

Case Chronology and Attorney Representation

In January 2018, a Montgomery County grand jury indicted Jackson for injury to a child. Trial began in May 2021, more than three years later. During that time, Jackson had five different attorneys represent him, one retained, and the rest appointed. Jackson's retained attorney was the fourth attorney on the case and withdrew in early 2019. The trial court appointed a fifth attorney shortly thereafter, who acted as standby counsel at trial.

6

The trial court's docket sheet reflects that on April 8, 2021, Jackson asked to represent himself, the trial court held a *Faretta* hearing, and the trial court allowed him to proceed *pro se*.[3] On April 26, 2021, Jackson filed his Motion for Continuance, unsupported by an affidavit and asked the trial court to move the case from May 2021 to August 2021. The trial court denied this continuance, and Jackson re-urged the motion following voir dire. He complained that he did not have time to prepare, and he lacked an investigator.

The morning trial began and after voir dire, Jackson provided an affidavit from an investigator hired by his former retained attorney, who outlined what had not been done in the case. The investigator's affidavit indicated he prepared a report in 2019 while working for the retained attorney, then provided a copy to appointed counsel along with a list of current discovery after the retained attorney withdrew. The investigator estimated there were twenty witnesses who had not been subpoenaed. Jackson made these same representations in his Motion for Continuance and argued that standby counsel did not utilize the investigator or pursue the same defensive theory the retained attorney did, and he had to start over.

---

[3]The record of the *Faretta* hearing is not made part of this appeal. *See Faretta v. California*, 422 U.S. 806, 835 (1975) (discussing accused's right to represent himself and ensuring he understood "the dangers and disadvantages of self-representation").

The trial court responded,

> I will note for the record that this case has been pending for over three years, that you've had multiple attorneys during that time. You have a court appointed lawyer that is now your standby attorney that was on this case for two years. I've approved thousands of dollars of expert witness money, thousands of dollars of investigative money. And you made the decision to represent yourself recently, aware – very aware that we had a trial date. So, you know, you made that choice. And I warned you and cautioned you when you made the decision to represent yourself that you need to be aware of the consequences of that.

The trial court denied Jackson's re-urged Motion for Continuance. The record also reflects Jackson filed a *pro se* Motion for Independent Taser Expert, which the trial court granted over a week before trial and approved an additional $4,000.

Suppression Hearing

The trial court conducted a hearing on Jackson's Motion to Suppress DVR surveillance video from inside his home. Jackson and multiple law enforcement witnesses testified during this hearing.

Jackson testified that A.T. passed away on October 15, 2016, and he spoke with Detective Michael Traylor over the phone and agreed to let them access the DVR. Jackson vaguely recalled signing a consent for the DVR for Corporal Tunstall with Precinct 3 while at the hospital. According to Jackson, he asked the detective to make copies, and Traylor agreed and told Jackson he would only have it for a few days. On October 19, 2016, Detective Vince Hatfield came to his house to get the DVR, and Jackson signed another consent for the DVR. Jackson agreed that neither

8

consent limited how long detectives could keep the DVR. Jackson said that after about a week, he "was calling and asking Detective Traylor about the copies[,]" but did not hear anything and felt he "was getting the run around[,]" so he withdrew his consent and requested the return of the DVR. He recalled talking with Traylor on October 30, and he expressed frustration about the timeline. At that time, Traylor told him that the DVR was part of an investigation, and they would not return it.

Vince Hatfield, a former detective with the Montgomery County Sheriff's Office in 2016, also testified. He testified that on October 19, 2016, he first obtained written consent from Jackson, then collected the DVR. Hatfield submitted the DVR to the lab the following day.

Traylor, the lead MCSO detective assigned to A.T.'s death investigation also testified. Traylor retired in 2017, and the case was transferred to Detective Chris Evans. Traylor testified he was contacted the night of A.T.'s death on October 15, 2016, and the Precinct 3 patrol original response team collected an hour's worth of surveillance video from the DVR system in the house when A.T. fell unconscious and before she was transported to the hospital. He did not speak to Jackson that night about the DVR but talked to him two days later and asked if they had his consent to pick up the DVR. Traylor testified that before he spoke with Jackson on October 17, Precinct 3 already obtained Jackson's consent regarding viewing the surveillance system on site. When Traylor spoke to them on October 17, Jackson agreed to let

9

them retrieve the DVR, and the agreement was not conditioned on how long they would have it. Traylor testified that Jackson signed a consent form after they spoke, and on October 20, 2016, the DVR was submitted to the crime lab.

Traylor explained that Detective Billy Ballard with the crime lab downloaded portions of video from the DVR system, but it was very time-consuming, and there was a limited portion he was able to retrieve. Traylor testified that when he reviewed the video and before Jackson withdrew consent, he saw images on the video that showed Jackson threatening A.T. with a stun gun. He also observed information and video on that DVR system relevant to the death investigation and delays in the request of medical care immediately leading up to A.T.'s death.

Based on what he saw on the DVR surveillance system on October 30, which showed Jackson threaten A.T. with what appeared to be a stun gun and her appearing fearful, and CPS intake reports, Traylor believed the DVR contained evidence of a crime specific to the tasing incidents. Ultimately, Traylor testified at the suppression hearing that when Jackson called him and requested his DVR system, Traylor had probable cause to believe it contained evidence of both A.T.'s death plus stun gun or tasing incidents involving A.T. Accordingly, he decided to retain that evidence and was concerned that the evidence could be destroyed if released. Traylor testified that when he reviewed the referenced video sections, he did so pursuant to Jackson's

consent. He later obtained a search warrant to download the DVR surveillance in its entirety for the months before A.T.'s death.

Detective Ballard testified at the suppression hearing regarding the DVR. In 2016 and 2017, Ballard worked in the crime lab and performed forensic downloads of digital evidence. Ballard was assigned the DVR at issue on October 20, 2016. He described initially receiving the DVR with Jackson's consent. He was told to download from 6 a.m. to 5 p.m. on the day A.T. died, and he performed that initial download on October 26 or 28. He explained why it was a difficult download process. In February 2017, a search warrant was signed in this case, and the DVR was resubmitted to the crime lab in March of 2017. The crime lab then purchased specialized software to make the download process easier and more efficient, and he completed the download in April 2017. Ballard testified that his role was to download the DVR's contents based on the signed search warrant and submit it to the primary detective.

The trial court denied the Motion to Suppress.

**Analysis**

Issue One: Denial of Motion to Suppress

In his first issue, Jackson asks whether the trial court erred in denying his motion to suppress the DVR surveillance video. It is undisputed that on October 15, 2016, Jackson consented to the search of his DVR and voluntarily turned it over to

11

investigators. He claims, however, that he withdrew his consent on October 30, 2016, but investigators refused to return the DVR and obtained a search warrant nearly four months later. The State counters that the consent-based search of the DVR revealed video evidence of Jackson threatening A.T. with a stun gun and delaying necessary medical treatment, such that at the time he revoked his consent, the facts and circumstances available to the investigator "would warrant a man of reasonable caution in belief" that the DVR contained evidence of a crime making the continued seizure of the DVR proper despite the revocation of his consent.

We generally review a trial court's denial of a motion to suppress under a bifurcated standard. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). We give almost total deference to a trial court's factual findings supported by the record especially when they are based on an evaluation of credibility and demeanor. *See State v. Lujan*, 634 S.W.3d 862, 865 (Tex. Crim. App. 2021) (quoting *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997)). Likewise, we afford almost total deference to a trial court's determinations of mixed questions of law and fact that depend on credibility and demeanor. *See id.* at 865–66. Where a trial court's application of law to the facts does not depend on credibility and demeanor, we conduct a de novo review. *See Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016). In ruling on a motion to suppress, the trial court is the exclusive trier of fact and judge of the witnesses' credibility. *Garza v. State*, 213 S.W.3d 338, 346 (Tex.

12

Crim. App. 2007); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). A trial court may choose to believe or disbelieve any part of a witness's testimony. *Garza*, 213 S.W.3d at 346. We must uphold the trial court's ruling on a motion to suppress, if the "ruling was supported by the record and was correct under any theory of law applicable to the case." *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003). Where the trial court does not make explicit findings of fact, we will review the evidence in the light most favorable to the trial court's ruling. *See Maxwell*, 73 S.W.3d at 281.

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. amend. IV; *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011). However, Fourth Amendment protections may be waived by an individual who consents to a search or seizure, and voluntary consent is an exception to the warrant requirement. *See Weaver*, 349 S.W.3d at 525–26 (citation omitted); *Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010). The State must prove voluntary consent by clear and convincing evidence. *Valtierra*, 310 S.W.3d at 448. A person may revoke his consent to search. *See Florida v. Jimeno*, 500 U.S. 248, 252 (1991); *Valtierra*, 310 S.W.3d at 450 (discussing revocation of consent in the context of entry to a home). If a person withdraws his consent before a search is completed, the police cannot continue searching based on the prior consent. *See State v. Villareal*, 475 S.W.3d 784, 800 (Tex. Crim. App. 2014) (explaining that

consent cannot have been revoked or withdrawn at the time of the search). Moreover, law enforcement may seize items under the plain view doctrine when conducting a consensual search. *Miller v. State*, 393 S.W.3d 255, 266 (Tex. Crim. App. 2012). "A police officer has probable cause to seize an item if 'the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime.'" *Williford v. State*, 127 S.W.3d 309, 313 (Tex. App.—Eastland 2004, pet. ref'd) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

Jackson undisputedly consented to the search of his DVR on October 15 and October 19, 2016, and voluntarily turned it over to investigators. Evidence at the suppression hearing also established that Jackson did not withdraw his consent until after Traylor watched the initial downloaded video showing him threatening A.T. with a stun gun. *See Rogmad v. State*, No. 02-14-00075-CR, 2015 WL 2341345, at *3 (Tex. App.—Fort Worth May 14, 2015, pet. ref'd) (mem. op., not designated for publication) (citing *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986)) (concluding that withdrawal of consent was untimely in context of officers opening safe and locating illegal drugs and trial court did not err in denying motion to suppress). Detective Traylor testified that while watching the video surveillance pursuant to Jackson's consent, he observed footage which gave him probable cause to believe Jackson may have committed the offense of injury to a child. Detectives

14

subsequently obtained a search warrant to download the DVR's entire contents, and the subsequent download was performed pursuant to the search warrant.

The trial court, as the exclusive trier of fact during the motion to suppress hearing, was free to believe Detective Traylor's testimony that he reviewed the initial downloaded material prior to Jackson's revocation of consent. *See Garza*, 213 S.W.3d at 346. Probable cause existed prior to Jackson revoking his consent which allowed officers to retain the DVR. *See id.* The trial court did not err in denying the motion to suppress. We overrule this issue.

Issue Two: Sufficiency of the Evidence to Support Bodily Injury

We next turn to Jackson's challenge to the sufficiency of the evidence. He argues that the State "failed to show any evidence of pain, there was no pain indicated during the incident on video, and no reasonable juror could have found Appellant guilty based on the evidence[.]"

We review challenges to the sufficiency of the evidence to support a finding of guilt under the standards established in *Jackson v. Virginia. See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). Under *Jackson*, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Herron v. State*, 625 S.W.3d 144, 152 (Tex. Crim. App. 2021). We defer to

15

the jury's responsibility "'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). We determine "whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all of the evidence." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). Our review is deferential to the jury's role in deciding what testimony to believe and how to weigh the evidence admitted at trial. *See Hooper*, 214 S.W.3d at 13 (citation omitted); *Edwards v. State*, 642 S.W.3d 7, 14–15 (Tex. App.—Beaumont 2021, pet. ref'd).

The indictment charged that Jackson "intentionally or knowingly cause[d] bodily injury to A.T., a person 14 years of age or younger, by administering an electric shock to A.T. with a stun gun and by contacting A.T. with a stun gun." In this case, the State had to prove Jackson intentionally or knowingly caused bodily injury to A.T. by shocking her with a stun gun. *See* Tex. Penal Code Ann. § 22.04(a)(3); *Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. 2018) (explaining that "as authorized by the indictment" means the offense's statutory elements as modified by the charging instrument). The Texas Penal Code defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." Tex. Penal Code Ann. § 1.07(a)(8).

16

"Any physical pain, however minor, will suffice to establish bodily injury." *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012) (citation omitted). A jury may infer a victim suffered physical pain from the facts and circumstances relevant to the alleged incident because people of common intelligence understand pain and some of its natural causes. *See id.*

The State presented video evidence that appeared to show Jackson contacting A.T. with a stun gun. The video also showed that A.T. jerked or recoiled away from the device. These videos were played for the jury, and several witnesses discussed them as the jury watched.

Dr. Pinneri testified that what she observed in the videos was consistent with administering an electrical shock. She explained, "What happens when the electrical charge is placed onto the skin, it causes the muscle to contract which is going to create an involuntary jerking kind of movement which is what you see her hand doing in that particular video." Dr. Pinneri further explained that A.T.'s reactions in the videos indicate she was experiencing pain, and "shocking hurts[.]" Dr. Pinneri testified that based on her review of the videos, she would not expect the shocks to leave marks on A.T.'s body. She also explained that even if a person has no lasting marks, it does not mean that it did not cause pain.

Detective Evans, who investigated this case, testified a stun gun could cause localized pain that lasts while it contacts the skin but would not leave lasting injuries

17

or marks. Evans operated a stun gun for the jury in the courtroom, which was the same make and model shown on a stun gun box located in Jackson's home. He explained to the jury while watching the videos that A.T.'s face appeared to "express pain" in response to the shock. Evans testified there were several occasions in the videos that he was positive that A.T. was shocked, and it caused pain.

Additionally, Wells testified that she overheard A.T. complain that "shocking hurts" and "shocking is hot" and mimicked the sound a stun gun made. Two incident reports Wells prepared were also admitted into evidence, which described in detail what A.T. said about shocking.

Jackson's Taser expert testified that he could not say from the videos whether Jackson contacted A.T. with the stun gun in the absence of sound in the videos. Jackson's expert explained, though, that a stun gun like Jackson had in the videos is meant to deliver a momentary painful shock.

Viewing the evidence in the light most favorable to the verdict, we conclude a reasonable factfinder could infer from the evidence in this case that A.T. suffered pain when Jackson shocked her with a stun gun, which satisfies the "bodily injury" statutory element. *See Jackson*, 443 U.S. at 319; *Garcia*, 367 S.W.3d at 688; *see also* Tex. Penal Code Ann. §§ 1.07(a)(8), 22.04(a)(3). We overrule issue two.

<u>Motion for Continuance</u>

In his third issue, Jackson argues the trial court erroneously denied his motion for continuance. He contends that less than twenty days after the court granted his request to proceed *pro se*, the trial court denied his Motion for Continuance. Jackson asserts he was unable to prepare for trial, specifically he did not have time to research or gather expert testimony. The State counters that Jackson likely failed to preserve error by filing an unsworn motion for continuance, but even if he did, the trial court did not abuse its discretion in denying the Motion for Continuance.

We review the denial of a motion for continuance for an abuse of discretion. *See Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006). A trial court does not abuse its discretion if its decision falls within the zone of reasonable disagreement. *Brumfield v. State*, 641 S.W.3d 568, 580 (Tex. App.—Tyler 2022, pet. ref'd).

"A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." Tex. Code Crim. Proc. Ann. art. 29.03. Further, "[a]ll motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance." *Id.* art. 29.08. "[I]n order to show reversible error predicated on the denial of a pretrial motion for continuance, a defendant must demonstrate both that the trial court erred in denying the motion and that the lack of

a continuance harmed him." *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010). A defendant's bare assertion that his defense counsel did not have adequate time to interview witnesses does not alone establish prejudice. *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995). The record must show with considerable specificity how defendant was harmed without the additional preparation time he requested. *Gonzales*, 304 S.W.3d at 842 (citation omitted).

We consider the case's circumstances and the reasons given to the trial court at the time the request is made and bear in mind "'the general interest in the prompt and efficient administration of justice.'" *Rosales v. State*, 841 S.W.2d 368, 374 (Tex. Crim. App. 1992) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *Gandy v. Alabama*, 569 F.2d 1318, 1323 (5th Cir. 1978)). Some factors we consider are: (1) the length of the requested continuance; (2) whether other continuances were requested and were they granted or denied; (3) the amount of time counsel had to prepare for trial; (4) whether another attorney was prepared to try the case; (5) the convenience or inconvenience posed to witnesses, opposing counsel, and the trial court; (6) whether there were legitimate or contrived reasons for requesting the continuance; (7) the case's complexity; and (8) the quality of appellant's representation. *Id.* (citations omitted).

This matter was pending for more than three years when trial began. During the case's pendency, Jackson went through multiple attorneys. A little over a month

20

before trial he elected to represent himself, and his appointed attorney who had been on the case for two years remained as standby counsel. This attorney requested and was granted a continuance.

Jackson filed a *pro se* Motion for Continuance approximately two weeks before trial, unsupported by an affidavit, and he asked the trial court to move the case from May 2021 to August 2021. The trial court denied the motion, and Jackson re-urged the motion following voir dire, presenting an affidavit from an investigator outlining uncompleted tasks. Jackson complained that he did not have time to prepare, and he lacked funds for an investigator. The trial court then explained why it was standing on its ruling denying Jackson's re-urged Motion for Continuance.

Even assuming the investigator's affidavit presented for the first time when Jackson orally re-urged his Motion for Continuance preserved error, under these circumstances, we cannot say the trial court abused its discretion. *See Brumfield*, 641 S.W.3d at 580 (holding that where appellant filed unsworn motion for continuance, he did not preserve it for review). The trial court expressly considered the length of time the matter had been pending, that multiple attorneys had been available to Jackson, the fact that the current standby attorney had been on the matter for over two years, and that Jackson recently chose to proceed *pro se* in the face of admonishments that the trial date would not be moved. Further, Jackson has failed to point out with any particularity the specific witnesses he planned to call, the

21

substance of their testimony, and how denying the continuance impeded their ability to testify. *See Heiselbetz*, 906 S.W.2d at 511–12 (explaining that an appellant must establish specific prejudice from the ruling). His bare assertions of harm are insufficient. *See id.* We overrule issue three.

Motion for Additional Funds

Next, Jackson contends the trial court erred in denying his motion for additional funds for an investigator after the trial court allowed him to represent himself. We disagree.

We review a trial court's decision on a motion for funds for an abuse of discretion. *See Griffith v. State*, 983 S.W.2d 282, 287 (Tex. Crim. App. 1998) (discussing motion for funds in the context of experts). The authorization of additional funds for an indigent defendant is within the trial court's sound discretion, and we will not find an abuse of discretion absent a showing of a specific need or how the defendant will be harmed if the funds are not approved. *See Castillo v. State*, 739 S.W.2d 280, 294 (Tex. Crim. App. 1987) (citing *Phillips v. State*, 701 S.W.2d 875, 894 (Tex. Crim. App. 1985), *overruled on other grounds by Hernandez v. State*, 757 S.W.2d 744, 751 n.15 (Tex. Crim. App. 1988)). It is Appellant's burden to show the trial court abused its discretion. *See id.*

An indigent defendant must have "access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985).

22

However, the State need not "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy." *Id.*; *see Ex parte Jimenez*, 364 S.W.3d 866, 877 (Tex. Crim. App. 2012). An indigent defendant is entitled to an expert "'available to consult with counsel, to interpret records, to prepare counsel to cross-examine State's witnesses, and generally to help present appellant's defense in the best light[,]'" even if he cannot or will not testify at trial. *Ex parte Jimenez*, 364 S.W.3d at 877 (quoting *De Freece v. State*, 848 S.W.2d 150, 160 n.7 (Tex. Crim. App. 1993)).

The defendant must make a preliminary showing that the issue for which they seek an expert is "likely to be a significant factor at trial[.]" *Ake*, 470 U.S. at 74; *Williams v. State*, 958 S.W.2d 186, 192 (Tex. Crim. App. 1997). To make this threshold showing, the defendant's claim must be based upon more than undeveloped assertions that the requested assistance would be beneficial. *Williams*, 958 S.W.2d at 192 (citation omitted). Generally, the defendant's motion must make the defensive theory clear to the trial court and be supported by factual allegations or evidence that expert testimony would support the theory. *Id.* (quoting *Rey v. State*, 897 S.W.2d 333, 341 (Tex. Crim. App. 1995)).

On appeal, Jackson complains that he needed additional funds for an investigator after he decided to represent himself, because he did not have access to

the reports that investigators prepared for the attorneys hired to represent him. These claims lack merit for the reasons discussed below.

The record before us establishes that prior to Jackson acting *pro se*, the trial court approved funds for an expert and an investigator. The trial court estimated he approved combined funds of close to $20,000 for Jackson's experts and investigator. The trial court approved at least $15,000 for an investigator while Jackson had a retained attorney. Jackson filed a *pro se* Motion for Independent Taser Expert, which the trial court granted over a week before trial and approved an additional $4,000. This expert, Staton, testified at trial for Jackson. Additionally, Dr. Brams, a child psychiatrist, testified for Jackson at trial as to the appropriateness of using electrical shocks as aversive conditioning in certain cases like A.T.'s. Both of these witnesses testified that based on the review of the videos, they could not say for sure Jackson shocked A.T. with the stun gun. However, neither witness disputed that stun guns caused pain. The record also established that the trial court allowed Jackson to have access to the internet to prepare for trial once he began representing himself.

Despite his complaint that he did not have access to the investigator's reports, Jackson makes no effort to describe any efforts he made to obtain these reports or why the investigator could not provide the previously prepared reports to Jackson. Jackson nor the investigator who provided an affidavit identified any specific witnesses, what efforts they made to locate them, how the prior investigative funds

24

were spent, why the funds already approved were insufficient, what these witnesses planned to testify to, or he defensive theory he was pursuing. *See Williams*, 958 S.W.2d at 192. Absent this information, Jackson has not shown how he was harmed by the trial court's refusal to approve additional investigative funds. *See Castillo*, 739 S.W.2d at 294. Accordingly, Jackson failed to meet his burden to show the trial court abused its discretion. *See id.* We overrule issue four.

Motion for Mistrial

In his last issue, Jackson asks whether the trial court erred by denying his Motion for Mistrial on the basis that he was shackled in front of the jury.[4] Jackson focuses on the fact that although he had been found guilty, the jury was still deliberating punishments and the enhancements. The State counters that Jackson's untimely Motion for Mistrial did not preserve error, and even so, the trial court did not abuse its discretion and there was no harm.

The record shows that given COVID restrictions, the jury was sequestered and deliberated in the courtroom to allow space for social distancing. After the close of punishment evidence and during the jury's punishment deliberations, jurors notified

---

[4]Jackson moved for a mistrial while the jury was deliberating his punishment, arguing he was shackled in front of the jury. He complains on appeal that the trial court denied his Motion for New Trial on the basis that he was shackled in front of the jury, but that Motion does not mention that he was shackled in front of the jury. We take this as a complaint that the trial court erroneously denied his Motion for Mistrial, as this is what his record cites reference.

the trial court they wanted to recess for the evening and resume deliberations the following morning. Before allowing the jury to recess for the evening, the trial court wanted to get Jackson's approval, so bailiffs transported him. The trial court explained that he intended for the bailiffs to bring Jackson into chambers, rather than the courtroom; however, the bailiffs brought Jackson into the courtroom, and the jury was seated in the gallery. There was a bench discussion regarding whether Jackson would agree to let the jury recess for the evening. During this discussion, Jackson noted that he was shackled and handcuffed, but he did not object, move for a mistrial, or ask the trial court to instruct the jury. Instead, he requested to go home for the evening rather than return to the jail, which the trial court denied. The next day, when the jury resumed deliberations, while in chambers, Jackson objected for the first time to being shackled in front of the jury the day before and moved for mistrial but failed to request an instruction.

The trial court denied the Motion for Mistrial and noted for the record that at no time had he ordered Jackson to be shackled in front of the jury, and when he requested that Jackson be brought over, his intent was that he brought into the chambers area. The trial court also noted that given the stage of the proceedings, the punishment evidence was over, argument and the reading of the charge had been completed, the brief time that Jackson was in front of the jury did not violate his

constitutional rights. The trial court explained that "it was not this court's intent to have him in front of the jury, it was an inadvertent happening."

We generally review the denial of a Motion for Mistrial for an abuse of discretion and "must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). "'Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required.'" *See id.* (quoting *Hawkins v. State,* 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)).

Efforts must be made to ensure the jury does not view the defendant in shackles; otherwise, a defendant's presumption of innocence is seriously infringed. *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991). Although the application of the presumption of innocence is questionable during the punishment phase, the trial court must maintain the defendant's due process right to a meaningful defense and conduct dignified proceedings. *See Deck v. Missouri*, 544 U.S. 622, 632–33 (2005) (discussing shackles during the punishment phase in the context of a death penalty case). Thus, courts may not routinely require defendants to appear in shackles before a jury during either the guilt or punishment phase of trial, but exceptional circumstances may demand that a trial court shackle a defendant. *See id.* at 628–29; *Long*, 823 S.W.2d at 283. Here, the record is clear that

27

the trial court did not order Jackson to appear shackled in front of the jury. The fact that he did so, although in the courtroom, was done inadvertently.

Even assuming Jackson preserved error by moving for mistrial the following day and that somehow the circumstances here constituted error, it does not require reversal. Error depriving a defendant of the presumption of innocence does not require reversal where the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.[5] *See* Tex. R. App. P. 44.2(a); *Montelongo v. State*, No. 09-16-00348-CR, 2018 WL 3370587, at *4 (Tex. App.—Beaumont July 11, 2018, no pet.) (mem. op., not designated for publication) (discussing shackled defendant and concluding beyond a reasonable doubt that it did not contribute to the defendant's punishment) (citing *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988)). Overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We consider the "totality of the circumstances" by examining the entire record. *See Miles v. State*, 204 S.W.3d 822, 828 (Tex. Crim. App. 2006).

---

[5]We expressly do not decide whether the inadvertent appearance of Jackson shackled in the jury's presence in this context constituted constitutional error. Nevertheless, in an abundance of caution, we have conducted our harm analysis under the stricter constitutional standard. *See* Tex. R. App. P. 44.2(a).

Based on the record before us, any alleged error was harmless beyond a reasonable doubt. When Jackson was shackled, the jury had already found him guilty, the punishment evidence had closed, arguments were concluded, the punishment charge had been read to the jury, and the jury had begun its deliberations. Jackson pled "true" to both felony enhancement paragraphs. Accordingly, the trial court instructed the jury in its charge to find both enhancement paragraphs "true."

Further, the State admitted the charging instruments and judgments from Jackson's prior convictions for robbery and aggravated robbery into evidence. A fingerprint witness that testified that Jackson's fingerprints matched those from these previous convictions. Jackson cross-examined this witness but did not offer any controverting evidence. While he called several family members as witnesses, none disputed his prior convictions, instead they discussed A.T.'s problems and Jackson's care of her. Additionally, Detective Evans and Dr. Pinneri testified again during punishment. Detective Evans discussed communications between Jackson and a caretaker indicating that at times, A.T. appeared unresponsive and unwell, but they did not take her to the hospital for medical care. Dr. Pinneri testified that the toxic effects of two medications, which she had not been prescribed, caused A.T.'s death, and the manner of death was homicide since she was unable to medicate herself.

We are confident that the shackles during a bench conference when Jackson was inadvertently brought into the courtroom did not affect the jury's deliberations

29

as to the enhancement of his punishment or in determining his sentence. We therefore conclude, beyond a reasonable doubt, that Jackson wearing shackles during the bench conference after punishment deliberations began did not contribute to his punishment. *See* Tex. R. App. P. 44.2(a); *Bell v. State*, 415 S.W.3d 278, 283 (Tex. Crim. App. 2013). We overrule Jackson's fifth issue.

## Conclusion

Having overruled Jackson's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on August 9, 2022
Opinion Delivered November 2, 2022
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.